UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DARRICK SINGLETON                    CIVIL ACTION NO. 6:20-cv-00931

VERSUS                               JUDGE SUMMERHAYS

COMMISSIONER, SOCIAL                 MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

The Commissioner of the Social Security Administration determined that the claimant, Darrick Singleton, is not disabled.  Mr. Singleton's appeal of that decision is now before the court.  Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

Mr. Singleton fully exhausted his administrative remedies before filing this action in federal court.  He filed applications for disability insurance benefits and supplemental security income benefits, alleging disability beginning on September 15, 2015.[1]  His applications were denied.[2]  He requested a hearing, which was held

---

[1]     Rec. Doc. 7-1 at 272, 274.

[2]     Rec. Doc. 7-1 at 96, 106.

in February 2018 before Administrative Law Judge Nancy M. Pizzo.[3]    The ALJ issued a decision in June 2018, concluding that Mr. Singleton was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4]  Mr. Singleton asked the Appeals Council to review the ALJ's decision.    The Appeals Council granted the request, vacated the ALJ's ruling, and remanded the matter for further proceedings.[5]    A second hearing was held in December 2019.[6]    In March 2020, the ALJ issued a second ruling, finding that Mr. Singleton was not disabled between the alleged disability onset date and the date of the new ruling.[7]    Mr. Singleton again asked the Appeals Counsel to review the ALJ's decision, but this time the Appeals Council found no basis for review.[8]  Therefore, the ALJ's second decision became the final decision of the Commissioner for the purpose of the Court's review.[9]    Mr. Singleton then initiated this action, seeking judicial review of the Commissioner's decision.

---

[3]      Rec. Doc. 7-1 at 46-94.

[4]      Rec. Doc. 7-1 at 119-129.

[5]      Rec. Doc. 7-1 at 136-137.

[6]      Rec. Doc. 7-1 at 71-94.

[7]      Rec. Doc. 7-1 at 21-32.

[8]      Rec. Doc. 7-1 at 7.

[9]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

## Summary of Pertinent Facts

Mr. Singleton was born on June 30, 1975.[10]  At the time of the ALJ's decision, he was 44 years old.  He attended college without obtaining a degree[11] and has relevant experience working in a warehouse and operating a forklift.[12]  He alleged that he became disabled on September 15, 2015[13] due to a back condition, diabetes, high blood pressure, and seizures.[14]

In May 2014,[15] Mr. Singleton was treated in the emergency room of Teche Regional Medical Center for viral gastroenteritis.  Testing performed at that time revealed that he had new onset diabetes with hyperglycemia.  He was prescribed Metformin.  He was also advised to obtain a blood glucose monitor, check his blood sugar level two to three times per day, avoid concentrated sweets, cut back on carbohydrates, drink plenty of fluids, and see a doctor of his choice "very soon."

In July 2014,[16] Mr. Singleton was again seen in the emergency room at Teche Regional.  He had experienced a seizure that was witnessed by his family and lasted

---

[10]     Rec. Doc. 7-1 at 97.

[11]     Rec. Doc. 7-1 at 49-50, 76, 311.

[12]     Rec. Doc. 7-1 at 50, 311, 324.

[13]     Rec. Doc. 7-1 at 50, 272, 274.

[14]     Rec. Doc. 7-1 at 97.

[15]     Rec. Doc. 7-1 at 423-428, 500-504.

[16]     Rec. Doc. 7-1 at 421, 450-453, 505-508.

for about one minute, included a loss of consciousness, and was followed by a period of confusion. A CT scan of his head showed no evidence of a mass, lesion, intracranial hemorrhage, or cerebrovascular accident ("stroke"). Mr. Singleton was advised to follow up with his physician in two to three days.

In January 2015,[17] Mr. Singleton again presented at Teche Regional's emergency room. He complained of burning, throbbing pain in both feet that had been ongoing for the past three months and was aggravated with weight bearing. He was able to walk, however, and his gait was steady. His extremities appeared grossly normal, he had no pain with palpation, circulation and sensation were intact in all extremities, and there were no signs of deep vein thrombosis. Mr. Singleton admitted that he was not compliant with his diabetic regimen. He was diagnosed with peripheral neuropathy and prescribed Ultram.

On February 3, 2015,[18] Mr. Singleton saw Dr. Eric Melancon at Tiger Island Medical Clinic. He complained of burning and throbbing pain in both feet, radiating to the calf, that began several months earlier. He had a history of Type 2 diabetes, and was taking Metformin, but not tolerating it well due to gastrointestinal side effects. Testing revealed a slight decrease in protective sensation in both feet. The doctor's assessment was peripheral neuropathy attributed to Type 2 diabetes. Lyrica

---

[17]    Rec. Doc. 7-1 at 454-457, 519-521.

[18]    Rec. Doc. 7-1 at 400-402.

and Tramadol were prescribed, additional testing was ordered, and a referral to a podiatrist was initiated.

Two weeks later, on February 18, 2015,[19] Mr. Singleton returned to the emergency room at Teche Regional, complaining of pain in both feet and having run out of Ultram.  He was taking only half the prescribed dosage of Metformin due to gastrointestinal upset.  He was encouraged to find a primary care doctor and instructed on the importance of eating a diabetic diet and complying with prescribed medication.  He had a rash on his left foot and moderate untreated athlete's foot without infection on both feet.  He was able to bear weight fully and to walk normally.  He was diagnosed with peripheral neuropathy and was prescribed Ultram. He was advised to get a primary care physician and to see a podiatrist.

A week later, on February 25, 2015,[20] Mr. Singleton returned to Teche Regional's emergency room, again complaining about foot pain and again having run out of Ultram.  He was able to fully bear weight and to walk.  He had a rash and moderate untreated athlete's foot with no secondary infection.  Circulation was intact in all of his extremities.  He was again advised to get established with a primary care provider for diabetes care and to see a podiatrist to get his athlete's foot under control

---

[19]    Rec. Doc. 459-462, 522-528.

[20]    Rec. Doc. 7-1 at 442-446.

and for long term monitoring of his feet. The doctor's impression was peripheral neuropathy. Ultram was prescribed.

Mr. Singleton returned to Teche Regional's emergency room on March 3, 2015.[21] He complained of groin pain due to an injury as well as pain in both feet. A sore or knot was observed on the top of his left fourth toe, and he reported that pain was going up from his feet to his calves when he stood for a long time. Neurontin was prescribed. He was again counseled to obtain a primary care physician.

The next day, Mr. Singleton went to the emergency room again.[22] He stated that the Neurontin did not alleviate his pain and did not agree with him. He reported that he became nauseated and broke out in a rash on his right arm after taking it. He was able to bear weight fully and was able to walk. Cracked skin was noted on the bottoms of both of his feet. The doctor's impression was peripheral neuropathy, and he prescribed Ultram.

Mr. Singleton returned to the emergency room on March 15, 2015,[23] complaining about foot pain and a rash on the left first and second toes. The rash was described as red and crusted and reportedly had started three days earlier. This

---

[21]     Rec. Doc. 7-1 at 437-441.

[22]     Rec. Doc. 7-1 at 432-436, 530-533.

[23]     Rec. Doc. 7-1 at 534-536.

was diagnosed as athlete's foot, and a topical cream was prescribed.  Tramadol was also prescribed.

Mr. Singleton returned to the emergency room on April 4, 2015,[24] complaining about weakness, dizziness, blurry vision, and pain in both feet.  He admitted that he had not checked his blood sugar level and was not taking his diabetes medication as directed.  He was given insulin and advised to follow up with an internist or endocrinologist.  He was diagnosed with uncontrolled Type II diabetes with hyperglycemia, and peripheral neuropathy.  Neurontin was prescribed.

On August 5, 2015, Mr. Singleton saw Dr. Adam J. Ziegenbusch, a foot and ankle specialist.[25]  He complained of aching, throbbing pain in both feet but denied having weakness, numbness, tingling, swelling, redness, warmth, drainage, or radiation.  He rated the pain at 8/10 and also reported rash, dryness, and cracking of the skin of his feet.  Skin rashes were observed on both feet.  Pulses in the arteries of both feet were slightly diminished.  There was pain to palpation in both feet.  Both feet had mild bunion deformities and lowering of the arches with pain.  Dr. Ziegenbusch diagnosed recurrent athlete's foot on both feet and prescribed Terbinafine.  He also diagnosed plantar fasciitis of both feet and prescribed

---

[24]     Rec. Doc. 7-1 at 463-469, 537-540.

[25]     Rec. Doc. 7-1 at 405-407.

Naproxen for that condition. He noted Mr. Singleton's Type 2 diabetes and advised him to check his feet daily.

Mr. Singleton saw Dr. Melancon again on June 24, 2015,[26] complaining of burning and throbbing foot pain primarily in the distal foot and toes, radiating to the calf. His feet were noted to be drying, cracking, oozing, and changing color. He had pain with palpation of his feet. The diagnoses were Type 2 diabetes and cellulitis or abscess. Dr. Melancon refilled Mr. Singleton's Metformin and prescribed Clindamycin, Duflucan, Nystatin, and Tramadol. He also referred Mr. Singleton to a podiatrist and an ophthalmologist.

On September 18, 2015, Mr. Singleton failed to show up for a diabetic eye examination that had previously been scheduled with Dr. Jared Thurston.[27]

On September 29, 2015, Mr. Singleton went to the emergency room at Teche Regional, complaining about his right small toenail.[28] He was diagnosed with a fungal infection of the toenails and athlete's foot. He was prescribed Lamisil and referred to a podiatrist.

---

[26]    Rec. Doc. 7-1 at 397-399.

[27]    Rec. Doc. 7-1 at 589.

[28]    Rec. Doc. 7-1 at 544-545.

On November 6, 2015,[29] Mr. Singleton returned to Teche Regional's emergency room, complaining of leg pain and athlete's foot. He reported that the Lamisil had not worked, he had not seen a podiatrist, and his athlete's foot had flared up. His circulation was intact in all extremities and he had no cellulitis or abscesses. Moderate bilateral athlete's foot without secondary infection was observed. He was prescribed Mentax.

Mr. Singleton had no further medical treatment for his allegedly disabling conditions until June 1, 2016 when he went to the emergency room at Teche Regional, complaining about foot pain.[30] He reported that he did not have a primary care physician and usually went to the emergency room for refills of Metformin. He also stated that he did not like to take medication for neuropathy. He had a normal gait, but both of his feet were swollen and painful. The doctor's impression was diabetic neuropathy, and he prescribed Neurontin as well as Metformin.

On June 14, 2016, Mr. Singleton saw physician's assistant Laura Gros at the Teche Action Clinic in Franklin, Louisiana, to follow up with regard to his diabetes.[31] He reported that he had run out of Metformin and complained that it gave him abdominal pain and diarrhea. He reported that he did not test his blood sugar

---

[29]     Rec. Doc. 7-1 at 547-549.

[30]     Rec. Doc. 7-1 at 575-577.

[31]     Rec. Doc. 7-1 at 581-588.

level.  He complained of foot pain radiating to his calves as well as sores and swelling on his feet.  He reported fatigue, occasional blurry vision, swelling of his angles, joint pain in his feet, ulcers, skin rashes, and dryness of his feet, and occasional tingling and numbness in his feet.  His gait was described as normal, and his nails were normal.  His feet had fissuring and moist ulcers in the webs of the toes as well as to the top and bottom of the feet, with dry and cracking of the surrounding skin.  His skin was tender to the touch, but his sensation and reflexes were normal. He was counseled with regard to diet.  He was diagnosed with essential hypertension, Type 2 diabetes mellitus with foot ulcer, and athlete's foot.  Clonidine and Lisinopril were diagnosed for the hypertension.  Keflex was prescribed for the athlete's foot and he was to use an over-the-counter Lamisil spray.  He was to continue the Metformin for diabetes, but in a lower dosage, he was started on an insulin medication, he was to keep a blood sugar log, and he was referred for an eye examination.  On June 16, Mr. Singleton reported that he had not started the insulin because he was feeling bad and vomiting but had taken the oral medications.

When Mr. Singleton saw nurse practitioner Kristi Boudreaux at the Teche Action Clinic for a shoulder injury on October 13, 2016,[32] it was noted that he was

---

[32]    Rec. Doc. 7-1 at 594-599.

noncompliant with his insulin and took it only when he felt bad.  He was counseled with regard to the long-term consequences of uncontrolled diabetes.

Mr. Singleton visited the emergency room at Teche Regional on March 3, 2017.[33]  He reported that he was out of his diabetes and hypertension medications and did not remember their names.  He complained of pain in the face and head as well as in both feet and legs.  Mild swelling in both legs was noted.  Range of motion was intact in all of his extremities, and he had a normal gait.  The differential diagnoses were hypertensive crisis and malignant hypertension.  He was prescribed Metformin and Lisinopril.

Mr. Singleton returned to the emergency room on June 23, 2017[34] because he had again run out of his medications and his feet were swollen.  He denied being in pain.  His skin had a normal color with no rashes, lesions, or evidence of cellulitis.  Circulation was intact in all of his extremities, and he had a normal gait.  He was given injections of Bumex (which treats fluid retention) and Levemir (which treats diabetes).  He was again prescribed Metformin and Lisinopril.

On September 22, 2017, Mr. Singleton established care for his hypertension and diabetes with Amber W. Sevin, a family nurse practitioner at L.J. Chabert –

---

[33]    Rec. Doc. 7-2 at 106-123.

[34]    Rec. Doc. 7-2 at 91-94, 99-100, 102-105.

Family Medicine in Houma, Louisiana.[35]  He denied having fatigue.  His lower extremities were swollen and he complained of arthralgias, a gait problem, and numbness.  It was noted that both of his feet and big toes were crusty.  His compliance with blood glucose monitoring was inadequate.  He was not taking any medications but had previously taken Lisinopril, Lantus, and Metformin.  He was referred to other health care providers for diabetes education and an ophthalmologic examination.  He was diagnosed with obesity, essential hypertension, and Type 2 diabetes mellitus without complication and without long-term use of insulin.  He was prescribed 81 mg. aspirin, Lisinopril (for high blood pressure), as well as Metformin and Toujeo (for diabetes).

Mr. Singleton followed up with nurse Sevin on October 13, 2017.[36]  She noted that he was compliant with treatment for his diabetes "most of the time" but he admitted to poor dietary compliance.  She adjusted his medications.

On February 26, 2018, Mr. Singleton testified at a hearing before ALJ Pizzo.[37] He stated that he was laid off from his job as a forklift operator and stockman in September 2015.  He gave two reasons for his being laid off:  first, the company he was working for no longer had the volume of business it previously had, and second,

---

[35]     Rec. Doc. 7-2 at 125-148, 207-221.

[36]     Rec. Doc. 7-2 at 163-181.

[37]     Rec. Doc. 7-1 at 46-69.

he had problems with fatigue and with his vision that prevented him from doing his job. He stated that he was seeing a doctor for his blurred vision that prevented him from recognizing faces from a distance, but he had not been prescribed glasses. He attributed the fatigue to his diabetes. He stated that he was taking both Metformin and insulin but neither was controlling his diabetes. He complained of swelling and nerve damage in both legs and painful ulcers on his feet. He testified that he cannot stand up too much and is required to keep his feet elevated as much as possible. He stated that he reads a lot.

On September 27, 2018, Mr. Singleton reestablished primary health care at Teche Action Clinic in Franklin, Louisiana.[38] He reported that he had been seen at Chabert but thought he received poor care. He reported that he had been out of insulin for a few days. He had upcoming appointments with a podiatrist and an ophthalmologist. He had been prescribed Gabapentin but was not taking it. He complained of calf and leg pain at rest that were noted to be consistent with peripheral vascular disease. He had no symptoms of fatigue, but he complained of blurred vision as well as tingling and numbness in both feet. Examination showed decreased sensation in both feet and dark discoloration of both feet and legs but no swelling. His gait was normal. He was counseled regarding his diet and the need

---

[38]     Rec. Doc. 7-2 at 256-260.

for compliance with his medication regimen. He was diagnosed with essential hypertension, hyperlipidemia, peripheral vascular disease, and Type 2 diabetes mellitus with mild nonproliferative diabetic retinopathy without macular edema. He was referred for a peripheral vascular disease evaluation. He was prescribed Metformin and insulin for his diabetes, Crestor for his hyperlipidemia, Lisinopril for his hypertension, as well as an 81 mg. aspirin. He was instructed to check his blood glucose level twice a day, follow a diabetic diet, and return in two weeks.

On October 10, 2018, Mr. Singleton saw a podiatrist at the Teche Action Clinic.[39] While the doctor's handwriting is largely illegible, it was noted that Mr. Singleton had diffuse callouses on both feet, a history of foot ulcers, and swelling of his feet. The doctor's assessments were edema, hyperkeratosis, and neuropathy. He noted hyperpigmentation of Mr. Singleton's lower legs and a loss of protective sensation in his feet.

On January 17, 2019, Mr. Singleton saw an ophthalmologist, Dr. A. Dulaney Tipton, IV.[40] The assessment was bilateral nuclear sclerosis as well as worsening nonproliferative diabetic retinopathy in both eyes with clinically significant macular edema in the right eye. Dr. Tipton referred Mr. Singleton to Dr. Priscilla A. Lao,

---

[39]     Rec. Doc. 7-2 at 252-255.

[40]     Rec. Doc. 7-2 at 232-236.

14

and Mr. Singleton saw her on January 25, 2019.[41]  Mr. Singleton reported that he had been out of insulin for about three weeks due to administrative issues with his primary care physician.  Dr. Lao counseled him regarding the need to control his diabetes to prevent further treatment, loss of vision, or complete blindness.  Because his vision was still good, however, no further treatment was undertaken.  He was to return in three to four months.

On March 9, 2019,[42] Mr. Singleton was seen in the emergency room at Teche Regional Medical Center for hyperglycemia, chronic diabetic neuropathy in both feet, and great toe skin necrosis.  He was advised to see a podiatrist, pay close attention to blood sugar control, and wear only open-toed sandals.

On August 8, 2019, Mr. Singleton followed up with nurse practitioner Emily Bergeron at the Teche Action Clinic.[43]  He complained of pain and swelling in both lower legs and reported that he had been out of his medicine for some time.  He had been scheduled to see Dr. Rochon for tests on his legs but did not do so.  He stated that he was seeing a cardiologist and also seeing Dr. Tipton for his eyes.  He had no symptoms of fatigue or burry vision, and his gait was normal.  The diagnoses were Type 2 diabetes mellitus with hyperglycemia, hyperlipidemia, essential

---

[41]       Rec. Doc. 7-2 at 237-241.

[42]       Rec. Doc. 7-2 at 243-244.

[43]       Rec. Doc. 7-2 at 246-250.

15

hypertension, long term current use of insulin, noncompliance with medication, and peripheral vascular disease.  Mr. Singleton was counseled regarding his diet.  The importance of medication compliance was stressed as was the importance of returning regularly for follow-up appointments.  He was prescribed insulin, Lipitor, Lisinopril, and Metformin.

On November 25, 2019,[44] Mr. Singleton saw Dr. Raghotham R. Patlola at Lafayette General Medical Center in Lafayette, Louisiana, complaining that his left leg was swelling and painful with some discoloration and a wound.  Dr. Patlola performed several procedures to evaluate the venous insufficiency and peripheral vascular disease in his legs, including bilateral lower extremity venogram, intravascular ultrasound of the bilateral common external and common femoral veins, percutaneous transluminal venoplasty and stenting of the right external iliac vein and the left common iliac vein, left lower extremity angiography, and laser atherectomy and percutaneous transluminal angioplasty of the left anterior tibial artery.  Mr. Singleton was referred to Dr. Noriega for evaluation of the wound on his left great toe, and he was prescribed Cipro and Plavix.

On December 9, 2019, Mr. Singleton again testified at a hearing before ALJ Pizzo.[45]  His attorney explained that he had undergone surgery a week and a half

---

[44]    Rec. Doc. 7-2 at 266-277.

[45]    Rec. Doc. 7-1 at 71-94.

earlier for vascular obstruction in his legs and also had a flesh eating bacteria infection on his left leg.  His counsel described Mr. Singleton's left great toe as appearing to be mangled due to the breakdown of the skin caused by diabetic neuropathy.  At the time of the hearing, Mr. Singleton was unable to wear shoes.  He stated that he had had trouble getting an appointment with a podiatrist but was scheduled to see one the next February.  He stated that the condition of his feet had worsened, especially the numbness that he experienced even while sitting down.  He also stated that blood vessels in both of his eyes were breaking and causing his far vision to be blurry.  He stated that he spends most of the day with his feet elevated.  He said that he reads a lot.  He stated that he takes Gabapentin for the diabetic neuropathy, which gives a little relief, but he does not like the way it makes him feel.

Mr. Singleton now seeks reversal of the Commissioner's adverse ruling.

## Analysis

A.   **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[46]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as

---

[46]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

17

a reasonable mind might accept as adequate to support a conclusion."[47]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[48]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[49]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[50]  Conflicts in the evidence[51] and credibility assessments[52] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[53]

---

[47]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[48]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[49]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[50]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[51]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[52]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[53]    *Wren v. Sullivan*, 925 F.2d at 126.

**B.**    <u>**Entitlement to Benefits**</u>

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[54]  The Supplemental Security Income program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[55]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[56]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[57]

---

[54]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[55]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[56]    42 U.S.C. § 1382c(a)(3)(A).

[57]    42 U.S.C. § 1382c(a)(3)(B).

19

## C.    <u>Evaluation Process and Burden of Proof</u>

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[58]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[59] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[60]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[61]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[62]  This burden may be

---

[58]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[59]    20 C.F.R. § 404.1520(a)(4).

[60]    20 C.F.R. § 404.1545(a)(1).

[61]    20 C.F.R. § 404.1520(e).

[62]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[63]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[64]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[65]

**D.    The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since September 15, 2015.[66]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:    diabetes, hypertension, obesity, peripheral neuropathy, plantar fasciitis, cellulitis, and bilateral foot infections.[67]    This finding is supported by substantial evidence in the record.

---

[63]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[64]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[65]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[66]    Rec. Doc. 7-1 at 23.

[67]    Rec. Doc. 7-1 at 24.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[68] The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that he must alternate positions hourly for thirty seconds, cannot operate foot controls, and cannot have concentrated exposure to extreme heat.[69] The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[70] The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from September 15, 2015 through March 10, 2020 (the date of the decision) because there are jobs in the national economy that he can perform. The claimant challenged this finding.

## E.    **The Allegations of Error**

Mr. Singleton contends that the ALJ erred (1) by failing to support her findings with substantial evidence; (2) by making unwarranted evidentiary conclusions; (3) by failing to accurately convey the claimant's limitations to the vocational expert; and (4) by failing to consider the applicability of SSR 96-9p. But

---

[68]    Rec. Doc. 7-1 at 24.

[69]    Rec. Doc. 7-1 at 26.

[70]    Rec. Doc. 7-1 at 31.

the arguments in the claimant's briefing do not fall neatly into those categories. This Court interprets the claimant's briefing as arguing that the ALJ improperly evaluated his residual functional capacity, improperly evaluated the evidentiary burden, and failed to accurately describe his impairments to the vocational expert.

**F.   Did the ALJ Err in Evaluating the Claimant's Residual Functional Capacity?**

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[71]   The ALJ is responsible for determining a claimant's residual functional capacity.[72]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability despite any physical and mental limitations.[73]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[74]   In making a residual functional capacity assessment, an ALJ must

---

[71]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[72]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[73]    *Martinez v. Chater*, 64 F.3d at 176.

[74]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of the claimant's impairments, even those that are not severe.[75]

The ALJ found that Mr. Singleton has the residual functional capacity to perform a reduced range of sedentary work. The claimant argued, however, that he lacks the ability to walk or sit for lengths of time consistent with the requirements of sedentary work. He testified at the hearing that he has foot pain and numbness in his legs when sitting and argued in his briefing that this impacts his residual functional capacity, making it impossible for him to perform even a limited range of sedentary work. He claimed that he was told by his doctor to elevate his legs, but no medical records documenting that alleged recommendation were located. Lower leg pain and swelling were documented in the treatment notes, and the claimant underwent surgery for venous insufficiency in November 2019. However, the vast majority of the treatment notes set forth in the record indicate that the claimant had a normal gait and no issues with standing, walking, or sitting. His foot and leg pain complaints usually correlated to times when he was not complying with the medication and dietary restrictions prescribed for his diabetes. As the ALJ noted in

---

[75] *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

her ruling, "it does not appear that the claimant complied with all treatment recommendations. . . the claimant failed to have regular follow up with a podiatrist or primary care.  The claimant also failed to control his blood sugar. . . .  the claimant report poor diet compliance as well as periods without proper testing or medications."[76]  There is no evidence in the record that the claimant's ability to walk or sit was determined by a treating physician to be restricted due to his medical conditions or impairments.

The claimant argued that the ALJ failed to properly consider his visual impairment in evaluating his residual functional capacity.  Mr. Singleton was diagnosed with diabetic retinopathy in both eyes, but his treating ophthalmologist expressly noted that his vision was not impaired.  Although he complained about having blurry distance vision, he testified that he spent a great deal of time reading.  Thus, the ALJ did not err in failing to restrict the claimant's ability to perform sedentary work based on his alleged lack of visual acuity.

Mr. Singleton argued that the ALJ erred by failing to consider the applicability of Social Security Ruling 96-9p in making her residual functional capacity ruling.  SSR 96-9p addresses a claimant's residual functional capacity for less than a full range of sedentary work.  Mr. Singleton made no specific citation to the ruling,

---

[76]     Rec. Doc. 7-1 at 26.

noting only that significant erosion of the occupational base could lead to a finding of disability.  He did not explain how he thought this ruling should be applied in this case other than suggesting that Mr. Singleton should have been found disabled.  His argument was vague and poorly supported; consequently, it lacks merit.

This Court concludes that the ALJ's residual functional capacity finding was based on substantial evidence in the record.  Therefore, the ALJ did not err in finding that Mr. Singleton has the residual functional capacity to perform a reduced range of sedentary work.

### G.    **Did the ALJ Improperly State the Evidentiary Burden?**

Mr. Singleton argued that the ALJ chided him for failing to provide documentation of his foot condition, attempted to require him to prove that his condition will not improve, and placed an unwarranted evidentiary burden on him.

A person seeking an award of Social Security benefits has the burden of showing that his impairments have lasted or can be expected to last for a continuous period of not less than twelve months.  With the cited comments, the ALJ was simply saying that Mr. Singleton failed to prove that the specific condition of his feet at the time of the most recent hearing and the venous insufficiency that required surgical intervention shortly before the hearing had lasted or would last for more than twelve months.  The claimant suggested that the appearance of his left great toe was sufficient evidence to establish that a disabling condition existed.  But none of the

26

claimant's physicians articulated such an opinion that can be found in the record. To the contrary, any necrosis in the claimant's foot was a relatively recent development, having been mentioned in the record in March 2019 – certainly not in 2015 when the claimant claimed he became disabled – and not more recently. The claimant's foot problems primarily consisted of neuropathic pain and inconsistently and ineffectively treated athlete's foot. Mr. Singleton suggested that a layperson observing his feet or the photographs he took with him to the hearing would conclude that he was disabled. But neither layperson observations nor the claimant's photographs constitute medical evidence of a disabling medical condition, and the ALJ did not err by declining to attach evidentiary significance to them.

Mr. Singleton was diagnosed with peripheral neuropathy in 2015, which the ALJ found to be a severe impairment. In September 2018, he was diagnosed with peripheral vascular disease. In November 2019,[77] he underwent surgery to treat venous insufficiency and peripheral vascular disease. Stents were placed in the right external iliac vein and the right common iliac vein, and the final venogram showed an excellent venographic result of the bilateral lower extremities. Angiogram of the left lower extremity was performed, showing a stenotic legion, which was successfully traversed. It was noted that Mr. Singleton tolerated the procedures well

---

[77] Rec. Doc. 7-2 at 266-277.

and had no immediate complications. There is no indication as to whether the success of these procedures meant that Mr. Singleton no longer had venous insufficiency or peripheral vascular disease or whether those conditions could be expected to continue to cause functional impairments into the future following the surgical intervention. Mr. Singleton was also referred to another doctor for treatment of the wound on his left great toe. There is no indication whether that wound was expected to resolve with proper treatment or last for more than a year.

Thus, while the claimant had ongoing complaints about his feet and legs from 2015 forward, the specific acute conditions he complained about at the hearing and in his briefing were not documented by a physician as expected to cause functional impairment for a year or more. Therefore, the ALJ could not consider them to be disabling conditions. It was the claimant's burden to present evidence in this regard, and he failed to do so.

While the claimant had a diagnosis of diabetic neuropathy going back to 2015, and a diagnosis of peripheral vascular disease in 2018, it is axiomatic that a diagnosis is not sufficient to establish that an impairment is severe,[78] to establish that an impairment meets or equals a listing,[79] or to establish that an impairment is

---

[78]    See, e.g., *White v. Saul*, No. 5-18-CV-00805-XR-RBF, 2019 WL 2642426, at *5 (W.D. Tex. June 26, 2019), report and recommendation adopted, 2019 WL 3816288 (W.D. Tex. July 18, 2019).

[79]    20 C.F.R. § 404.1525(d).

disabling.[80]  In order for a person to be found to be disabled, his medical conditions must result in functional impairments that prevent him from working.[81]  In this case, Mr. Singleton did not provide evidence sufficient to show that his medical conditions impair his functionality to a degree that such a conclusion can be reached.

## H.    Did the ALJ Accurately Convey the Claimant's Limitations to the Vocational Expert?

To determine whether there are jobs in the national economy that the claimant could perform, the ALJ questioned the vocational expert at the hearing regarding a hypothetical person with the claimant's age, education, and past work experience but limited to sedentary work, unable to operate foot controls, unable to be exposed to extreme heat, and required to alternate positions hourly.  The vocational expert responded that there were jobs that the hypothetical person could perform.  Mr. Singleton argued, however, that the vocational expert's opinion was not supported by substantial evidence because (1) changing positions by standing for thirty seconds once an hour is not a fair accommodation for a person with chronic bilateral diabetic neuropathy and peripheral vascular disease and (2) the hypothetical question did not incorporate deficiencies in vision.

---

[80]    See *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990).  See, also, *Hames v. Heckler*, 707 F.2d at 165.

[81]    *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity.").

A hypothetical question posed to a vocational expert is not defective if it reasonably incorporates all disabilities of the claimant recognized by the ALJ and if the claimant or his representative is given an opportunity to correct deficiencies in the ALJ's question by suggesting to the vocational expert any purported defects in the ALJ's hypothetical question.[82]    In this case, both criteria were satisfied. Accordingly, Mr. Singleton's arguments lack merit.

The ALJ's hypothetical question incorporated four limitations:  sedentary work, no use of foot controls, no exposure to extreme heat, and the ability to change positions hourly.  Mr. Singleton presented no evidence to show that changing positions for thirty seconds once per hour is not a fair accommodation for a sedentary worker with Mr. Singleton's impairments.  He offered no opinions from a physician or other medical professional regarding what would constitute a satisfactory accommodation.  When a claimant offers no evidence contrary to the vocational expert's testimony, the claimant fails to meet his evidentiary burden, at step five of the disability analysis, of proving that he was incapable of performing the jobs identified by the vocational expert.[83]

The ALJ did not err in failing to include a lack of visual acuity in the impairments listed in the hypothethical question since there is substantial evidence

---

[82]    *Bowling v. Shalala*, 36 F.3d at 436.

[83]    *Perez v. Barnhart*, 415 F.3d at 464.

in the record that Mr. Singleton's vision is not affected by his eye problems. Absent evidence of vision problems, the ALJ was not required to include vision problems in the hypothetical question.

Furthermore, the claimant had an opportunity to question the vocational expert at the hearing but did not ask anything about the hourly change of position or about the claimant's alleged vision problem. His counsel questioned the expert witness and established that no jobs would be available if Mr. Singleton was required to elevate his legs for two hours per day, but there is no evidence in the record that Mr. Singleton's physicians have imposed this restriction on him. Therefore, there was no requirement that the ALJ recognize such a restriction.

For these reasons, this Court finds that the ALJ did not err in questioning the vocational expert or in relying upon his answers to her questions.

## **Conclusion and Recommendation**

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner should be AFFIRMED, and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[84]

Signed in Lafayette, Louisiana, this 3rd day of August 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[84]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).